**Exhibit A**

*7/7/17 @3PM*

**SUM-100**

# SUMMONS
## *(CITATION JUDICIAL)*

| | |
|---|---|
| **NOTICE TO DEFENDANT:** <br> *(AVISO AL DEMANDADO):* <br><br> FCA US LLC, a Delaware Limited Liability Company, and DOES 1 through 10, inclusive <br><br> **YOU ARE BEING SUED BY PLAINTIFF:** <br> *(LO ESTÁ DEMANDANDO EL DEMANDANTE):* <br><br> SANDY G. SELF | **FOR COURT USE ONLY** <br> *(SOLO PARA USO DE LA CORTE)* <br><br> E-FILED <br><br> 7/14/2017 <br><br> FRESNO COUNTY SUPERIOR COURT <br><br> By: D Flautz, Deputy |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: <br> *(El nombre y dirección de la corte es):* <br> B. F. Sisk Courthouse <br> 1130 O Street <br> Fresno, CA 93721 | **CASE NUMBER:** <br> *(Número del Caso):* 17CECG02355 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Knight Law Group, LLP
1801 Century Park East, Suite 2300, Los Angeles, CA 90067
(310) 552-2250

| DATE: <br> *(Fecha)* 7/14/2017 | Clerk, by D Flautz <br> *(Secretario)* | , Deputy <br> *(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* FCA US LLC, a Delaware Limited Liability Company

   under: ☐ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)     ☐ CCP 416.90 (authorized person)
          ☒ other *(specify):* Corporation Code 17061 (Limited Liability Company)
4. ☐ by personal delivery on *(date):*

[SEAL]

Page 1 of 1

| Form Adopted for Mandatory Use <br> Judicial Council of California <br> SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 <br> www.courtinfo.ca.gov <br><br> American LegalNet, Inc. <br> www.FormsWorkflow.com |
|---|---|---|

**KNIGHT LAW GROUP, LLP**
Steve Mikhov (SBN 224676)
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: (310) 552-2250
Fax: (310) 552-7973

Attorneys for Plaintiff,
SANDY G. SELF

E-FILED
7/13/2017 10:44:46 AM
FRESNO COUNTY SUPERIOR COURT
By: D Flautz, Deputy

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF FRESNO

| | |
|---|---|
| SANDY G. SELF, | Case No.: 17CECG02355 |
| Plaintiff, | Unlimited Jurisdiction |
| vs. | **COMPLAINT** |
| | 1. **BREACH OF EXPRESS WARRANTY – VIOLATION OF SONG-BEVERLY ACT** |
| FCA US LLC, a Delaware Limited Liability Company; and DOES 1 through 10, inclusive, | 2. **BREACH OF IMPLIED WARRANTY – VIOLATION OF SONG-BEVERLY ACT** |
| Defendants. | 3. **FRAUDULENT INDUCEMENT – CONCEALMENT** |

Plaintiff, SANDY G. SELF, alleges as follows against Defendants, FCA US LLC, a Delaware Limited Liability Company, ("FCA US LLC"), and DOES 1 through 10 inclusive, on information and belief, formed after an inquiry reasonable under the circumstances:

-1-

SELF v. FCA US LLC - COMPLAINT

**DEMAND FOR JURY TRIAL**

1.  Plaintiff, SANDY G. SELF, ('Plaintiff'), hereby demands trial by jury in this action.

**GENERAL ALLEGATIONS**

2.  Plaintiff is an individual residing in the City of Fresno, County of Fresno, and State of California.

3.  Defendant FCA US LLC is and at all relevant times was a Delaware Limited Liability Company registered to do business in the State of California with its registered office in the City of Los Angeles, County of Los Angeles, and State of California.

4.  This cause of action arises out of the warranty obligations of FCA US LLC for a vehicle purchased by Plaintiff from FCA US LLC and for which FCA US LLC issued a written warranty.

5.  Plaintiff does not know the true names and capacities, whether corporate, partnership, associate, individual or otherwise of Defendant issued herein as Does 1 through 10, inclusive, under the provisions of section 474 of the California Code of Civil Procedure. Defendant Does 1 through 10, inclusive, are in some manner responsible for the acts, occurrences and transactions set forth herein, and are legally liable to Plaintiff. Plaintiff will seek leave to amend this Complaint to set forth the true names and capacities of the fictitiously named Defendant, together with appropriate charging allegations, when ascertained.

6.  All acts of corporate employees as alleged were authorized or ratified by an officer, director or managing agent of the corporate employer.

7.  Each Defendant whether actually or fictitiously named herein, was the principal, agent (actual or ostensible), or employee of each other Defendant and in acting as such principal or within the course and scope of such employment or agency, took some part in the acts and omissions hereinafter set forth by reason of which each Defendant is liable to Plaintiff for the relief prayed for herein.

8.  On December 9, 2010, Plaintiff purchased a new 2011 Jeep Liberty , VIN:1J4PN5GK8BW535012, ("the Subject Vehicle"). The sales contract is attached and incorporated by its reference as Exhibit 1.

9.  Plaintiff hereby revokes acceptance of sales contract.

10. Plaintiff hereby demands trial by jury in this action.

### The Totally Integrated Power Module (TIPM) Defect

11. The Subject Vehicle was factory-equipped with a Totally Integrated Power Module ("TIPM") which is located under the hood in the vehicle engine compartment. FCA US LLC equipped the Subject Vehicle with a TIPM that FCA US LLC refers to as the "TIPM 7."

12. The TIPM is the chief component in the Subject Vehicle's power distribution systems and consists of a computer, relays, fuses, and controls. The TIPM provides the primary means of voltage distribution and protection for the entire vehicle and FCA US LLC acknowledges that the TIPM is intended to provide safe, reliable, and centralized distribution of power to the Subject Vehicle's electrical systems.

13. The electrical systems that receive power distributed by the TIPM include the vehicles' safety systems, security system, ignition system, fuel system, electrical powertrain, and the vehicles' comfort and convenience systems. These systems control components including the air bags, fuel pump, windshield wipers, headlights, taillights, turn signals, and power windows and doors.

14. The TIPM installed in the Subject Vehicle is defective and thus fails to reliably control and distribute power to various vehicle electrical systems and component parts.

15. As a result of the TIPM defect, the Subject Vehicle has had the following issues:

    a.  The check engine light comes on frequently;

    b.  Multiple electrical issues; and,

    c.  Numerous recalls.

16. The TIPM in the Subject Vehicle is likely to cause a variety of electrical issues such as a loss of headlight function, and unexpected distractions, such as the vehicle's horn or alarm sounding while on a roadway, which may each increase the risk of injury for the driver, passengers, or others on the roadway.  The defective TIPM imposes a substantial safety risk to the operator of the vehicle and surrounding drivers.

SELF v. FCA US LLC - COMPLAINT

1   17. FCA US LLC has instructed employees in multiple divisions to investigate the TIPM
2   defect. As recently as spring 2012, teams were investigating vehicles equipped with the TIPM-7
3   not starting, having difficulty starting, and stalling, attributed to a malfunctioning fuel pump relay
4   integral to the TIPM printed circuit board.

5

6                    **FCA US LLC's Knowledge of the TIPM Defect**

7   18. FCA US LLC had superior and exclusive knowledge of the TIPM defects, and knew or
8   should have known that the defects were not known by or reasonably discoverable by Plaintiff
9   before Plaintiff purchased or leased the Subject Vehicle.

10  19. FCA US LLC's knowledge of the TIPM-7 defects since at least 2007 is demonstrated by
11  the numerous consumer complaints submitted to FCA US LLC and to NHTSA, multiple TIPM-
12  related recalls and technical service bulletins, two NHTSA investigations into TIPM-related
13  complaints, FCA US LLC's exhaustive pre-release vehicle testing, and FCA US LLC's exclusive
14  access to post-sale data about the performance of and repairs made to its vehicles. The use of
15  limited recalls and TSBs as stop-gap measures demonstrates a pattern of concealment and
16  improper denial of the TIPM defect by FCA US LLC.

17  20. FCA US LLC vehicles have been plagued with severe TIPM problems for the past decade.
18  As a result, FCA US LLC has initiated multiple TIPM-related recalls to address safety or
19  emissions concerns.

20  21. An automotive manufacturer service bulletin typically takes time to develop and issue
21  because the manufacturer needs to identify and understand the problem, develop and test the new
22  repair instructions, and draft and finalize the bulletin before distributing it to dealerships.

23  22. The defect is so widespread that TIPM 7 replacement parts have often been on national
24  backorder, with drivers reporting from 2011 to 2014 that they had to wait weeks or months to have
25  their TIPMs replaced. In the meantime, FCA US LLC dealerships and auto-technicians are
26  advising many drivers not to drive their vehicles until the TIPM is replaced, due to safety risks.
27  ///
28  ///

*NHTSA Recall 05V-461*

*(Defective TIPM-6 Causing Vehicles to Roll Away Without Warning)*

23. In October 2005, FCA US LLC recalled model year ("MY") 2006 Dodge Ram 1500 4x4 vehicles to reprogram (i.e., "flash") the TIPM-6 with new software to cure a safety-related defect.

24. The defect was that the TIPM-6 could have incorrect transfer case calibration set points. As a consequence, the transfer case could shift into neutral without warning and, if the parking brake were not engaged, the vehicle could roll away.

25. FCA US LLC admitted that because of the defect, "the vehicle could roll away with the transmission in the Park position and cause a crash without warning."

26. This defect shows that FCA US LLC was aware of the dangerous, life-threatening consequences of a defective TIPM. Yet, despite this knowledge, FCA US LLC manufactured the next generation TIPM, the TIPM-7, without resolving the module's propensity to cause life-threatening crashes.


*NHTSA Investigation PE07-027 / NHTSA Recall 07V-291*

*(Defective TIPM Causing Engine Stalling)*

27. In May 2007, NHTSA's Office of Defect Investigation ("ODI") opened Preliminary Evaluation PE07-027.

28. The ODI had received 53 consumer complaints alleging incidents of engine stalling in MY 2007 Jeep Wrangler vehicles, prompting the evaluation. Most of the stalls occurred suddenly, and in 12 of them a loss of electrical power causing a loss of vehicle lighting coincided with the stalls.

29. The purpose of NHTSA's evaluation was to assess the frequency, scope, and safety consequences of the defect in the subject vehicles.

30. The ODI agreed to close the evaluation when, on July 3, 2007, FCA US LLC agreed to recall approximately 80,894 MY 2007 Jeep Wrangler and MY 2007 Dodge Nitro vehicles (NHTSA Recall 07V-291).

31. To remedy the stalling problem, FCA US LLC agreed to reprogram the TIPM in the subject vehicles with revised software. FCA US LLC admitted that there was an "issue" with the

SELF v. FCA US LLC - COMPLAINT

1    TIPM "that could result in an engine stall while driving," which could "cause a crash without
2    warning."

3        32. At the time the evaluation as closed, the ODI had received 230 consumer complaints, two
4    of which involved crashes and injuries.  FCA US LLC had directly received 279 complaints by this
5    time.

6        33. This recall did not cure all of the TIPM defects in the 2007 Dodge Nitro, as demonstrated
7    by the fact that the 2007 Dodge Nitro was recalled again in November 2009 for a safety defect
8    concerning TIPM-related windshield wiper problems.

9        34. Because the same TIPM was installed in the MY 2007 Dodge Nitro as in the Vehicle, this
10   recall demonstrates FCA US LLC's knowledge of the defective TIPM in the Vehicle.

11       35. This recall did not resolve the stalling problems caused by the faulty TIPM, as
12   demonstrated by a consumer complaint submitted to NHTSA on February 7, 2008 in which the
13   complainant describes stalling in a MY 2007 Jeep Wrangler *after* having the recall repairs, and
14   subsequently being told by a dealership service manager that the TIPM had to be replaced to cure
15   the stalling problem (NHTSA ID No. 10217364, included in its entirety below.)

16

17                          *Emissions Recall 2007-15-E (G23)*
18                      *(Drivability Concerns Resulting from TIPM-7)*

19       36. In June 2007, FCA US LLC released an emission recall on certain vehicles equipped with
20   the TIPM-7.  The recall was conducted to reprogram the vehicles' TIPM to prevent a condition
21   where during some trips the vehicles would have only a single forward gear ratio available.  FCA
22   US LLC admitted that "[b]oth emissions and drivability would be affected when vehicle is stick in
23   one forward gear."

24

25                          *Technical Service Bulletin 08-018-08*
26                      *(Defective TIPM Causing Inability to Record Data)*

27       37. In May 2008, FCA US LLC distributed TSB 08-018-08 to its nationwide network of
28   authorized dealers and service providers.

---

-6-

SELF v. FCA US LLC - COMPLAINT

1    38. This TSB is not publicly available, either in summary form or in its entirety, because

2    neither FCA US LLC nor NHTSA classified the TIPM defect addressed in the TSB as a *safety*

3    *defect.*

4       39. The TSB covered several 2008 MY vehicles equipped with a TIPM-7.

5       40. The TIPM defect purportedly resolved by this TSB involved data recording – specifically,

6    the inability to record data because of TIPM software problems.

7       41. The TSB states that "[d]ata recording is a valuable tool that provides assistance in

8    diagnosing difficult to duplicate customer concerns. Some of the[se] models… were incapable of

9    utilizing the data recording features due to software compatibility concerns within the TIPM." In

10   other words, FCA US LLC admitted internally that owners and lessees of these vehicles would

11   suffer mechanical problems with their vehicles, take the vehicles in for repair, and be told that the

12   onboard computer did not show that any mechanical "event" or "problem" had occurred. Any

13   reasonable consumer who has taken her car in for repairs would view this as a maddening scenario.

14      42. It is troubling that this TIPM defect has not been classified as a safety defect. Although the

15   failure to record data itself does not appear to cause a loss of vehicle control and is probably

16   unnoticed by the driver, the failure to record real-time data could fail to record the manifestation of

17   a safety defect, such as stalling, that would present a life-threatening safety hazard. FCA US

18   LLC's, as well as consumers', ability to detect the manifestation of a safety defect was severely

19   compromised by the inability to record data caused by the defective TIPM.

20      43. Because the TIPM installed in these vehicles is the same as in the Vehicle, FCA US LLC

21   was aware – yet again – that the TIPM installed in the Vehicle was defective, and chose a stop-gap

22   remedy on a limited set of vehicles.

23      44. Because the TSB was not publicly available, owners and lessees of these vehicles were

24   unaware of the issue and many of them likely did not obtain the TIPM repair described in the TSB.

25      45. By proceeding with a non-public TSB instead of a publicly-announced safety recall, FCA

26   US LLC chose to remain willfully blind about the manifestation of safety defects that a properly

27   functioning TIPM would have enabled the data recorder to record.

28   ///

46. Rather than disclose the TIPM problem and offer an adequate solution, FCA US LLC attempted to conceal it by advising its network of authorized dealers and service providers to update and/or flash the TIPM instead of replacing it.

*NHTSA Recall 09V-438*

*(Defective TIPM Windshield Wiper Relays Increasing Risk of a Crash)*

47. In November 2009, FCA US LLC notified NHTSA of a safety defect affecting the windshield wiper system on certain vehicles equipped with the TIPM-7.

48. The TIPM was defective in that a relay controlling the wipers could short out, causing the wipers to fail, in turn causing impaired driver visibility increasing the risk of a crash.

49. FCA US LLC recalled 84,680 vehicles to reprogram the TIPM.

50. Because the TIPM in the vehicles subject to this recall and in the Vehicle is the same, this recall demonstrates that FCA US LLC knew, at the time that Plaintiff purchased or leased the Vehicle, that the TIPM was defective.

*Technical Service Bulletin 08-053-11*

*(Defective TIPM Causing Failure to Start and Intermittent Alarm Sound)*

51. In August 2011, FCA US LLC distributed TSB 08-053-11 to its nationwide network of authorized dealers and service providers.

52. This TSB is not publicly available, either in summary form or in its entirety, because neither FCA US LLC nor NHTSA have classified the TIPM defect addressed in the TSB as a safety defect.

53. This TSB covered numerous vehicles equipped with the TIPM-7.

54. The TIPM was defective in that the vehicle theft alarm would intermittently sound for no apparent reason and the vehicles would fail to start.

55. The TSB's purported fix was to flash reprogram the TIPM with new software.

56. It is troubling that this TIPM defect has not been classified as a safety defect. If a vehicle alarm sounds during regular operation of the vehicle, it could be so jarring and distracting as to

1  cause the driver to lose control of the vehicle. Once again, FCA US LLC chose to address this

2  problem internally rather than conduct a safety recall which would have alerted its customers,

3  NHTSA, and the public to the ongoing, repeated safety problems with the TIPM.

4      57. Because the TIPM installed in these vehicles is the same as in the Vehicle, FCA US LLC

5  was aware—once again—that the TIPM installed in the Subject Vehicle was defective, and again

6  chose an inadequate stop-gap remedy on a limited set of vehicles.

7      58. Rather than disclose the TIPM problem and offer an adequate solution, FCA US LLC

8  attempted to conceal it by advising its network of authorized dealers and service providers to

9  update and/or flash the TIPM instead of replacing it.

10

11      *NHTSA Recall 13V-282*

12      *(Defective TIPM Causing Non-Deployment of Active Head Restraints)*

13      59. In July 2013, FCA US LLC initiated yet another TIPM-related safety recall. FCA US LLC

14  notified NHTSA that the airbag warning lamp would incorrectly illuminate due to an electrical

15  overstress condition within the Occupant Restraint Controller Module ("ORCM"), which would in

16  turn cause the active head restraints to not deploy in certain rear-impact collisions, thereby

17  increasing the risk of injury to a front seat occupant.

18      60. FCA US LLC recalled approximately 442,481 vehicles to flash the TIPM or replace the

19  ORCM, as required. The TIPM was flash reprogrammed in certain vehicles equipped with the

20  TIPM-7.

21      61. Once again, this recall evidences FCA US LLC's knowledge of the defective TIPM and

22  shows FCA US LLC's repeated attempts to employ inadequate piecemeal remedies on the Subject

23  Vehicle.

24

25      *Center for Auto Safety Submits Defect Petition to NHTSA*

26      62. On August 21, 2014, the Center for Auto Safety ("CAS") submitted a defect petition to

27  NHTSA, requesting that NHTSA "initiate a safety defect investigation into failures associated with

28  the [TIPM] installed in FCA US LLC SUVs, trucks, and vans beginning in the 2007 model year."

1  The petition noted that TIPM failures result in a variety of safety-related problems, "many of
2  which have the potential for destructive results," such as stalling, airbag non-deployment, failure
3  of fuel-pump shutoff, and vehicle fires.

4       63. CAS had received at least 70 complaints related to the TIPM in FCA US LLC vehicles, and
5  a stall/no-start condition was the most reported outcome of TIPM failure. Seventeen of these
6  complaints report engine stalling and 34 report a failure to start. Two of them report smoke and
7  one reports a vehicle fire.

8       64. The CAS petition asserts that FCA US LLC's previous TIPM-related recalls were
9  insufficient "to address the TIPM problem widespread throughout FCA US LLC's fleet, instead
10 focusing on a highly limited set of vehicles and circumstances."

11      65. Plaintiff has suffered the consequences of the TIPM failure described by CAS, and Plaintiff
12 agrees with CAS's characterization of the TIPM problem as widespread throughout FCA US
13 LLC's fleet and in the Vehicle.

14

15                                    *NHTSA Recall 14V-530*
16                          *(Failure of Fuel Pump Relay Within the TIPM)*

17      66. On September 3, 2014, FCA US LLC notified NHTSA of yet another TIPM-related safety
18 defect. This time, the fuel pump relay within the TIPM could fail, causing stalling without warning
19 or failure to start. In FCA US LLC's words, "[t]he vehicle may intermittently or permanently: not
20 start, not start the first time, not stay running upon start, stall, or the fuel pump may stay energized
21 upon vehicle shutdown," and "[a]n intermittent or failed fuel pump relay could cause the engine to
22 stall while driving and cause a crash without a warning."

23      67. The remedy under the recall was to install a new fuel pump relay external to the TIPM.
24 FCA US LLC may have decided that resolving the problem within the TIPM was not feasible,
25 given the extensive defects and problems within the TIPM.

26      68. The recall covered 188,723 vehicles equipped with the TIPM-7.

27      69. Yet again, this recall demonstrates FCA US LLC's knowledge that the TIPM in the Subject
28 Vehicle was defective. And again, FCA US LLC chose to implement an inadequate piecemeal

1  remedy.

2

3          *NHTSA Agrees to Evaluate the CAS Defect Petition*

4      70. On September 8, 2014, the CAS supplemented its defect petition with additional consumer

5  complaints about the TIPM. In the supplement, the CAS identified 24 crashes from NHTSA's

6  Early Warning Reporting ("EWR") database that the CAS believes may be related to TIPM failure.

7  Crash reports in the EWR database are submitted by the vehicle manufacturer, demonstrating FCA

8  US LLC's awareness of these crashes.

9      71. On September 25, 2014, NHTSA's ODI opened Investigation DP14-004 to evaluate the

10  CAS's defect petition. The investigation will "review allegations of [TIPM] failures resulting in

11  engine stall while driving, airbag non-deployment incidents, unintended acceleration and/or

12  vehicle fire in certain . . . vehicles . . . equipped with TIPM-7 modules and manufactured by FCA

13  US LLC Group LLC[.]"

14      72. The ODI investigation covers approximately 4,800,000 vehicles equipped with the TIPM-

15  7.

16      73. On September 30, 2014, the CAS submitted another supplement to its defect petition,

17  including approximately 25 new consumer complaints about the TIPM that it had received.

18      74. With CAS's submission of its defect petition and supplements, and NHTSA's opening of

19  the investigation, FCA US LLC is aware of all of the TIPM-related complaints made to the CAS.

20  This is in addition to all of the TIPM-related complaints made to NHTSA about which FCA US

21  LLC is, and has been, aware. At the very least, FCA US LLC has constructive knowledge of the

22  consumer complaints submitted to NHTSA, which are publically available on the NHTSA website.

23      75. In response to a request for information by NHTSA, FCA US LLC stated the following in a

24  December 12, 2014 letter to NHTSA:

25          a.  FCA US LLC had identified 709 reports which relate or may relate to the TIPM in

26              the subject vehicles, representing 199 unique vehicle identification numbers

27              ("VINs").

28  ///

b. FCA US LLC had identified 605 consumer complaints, made to FCA US LLC, which relate or may related to the TIPM in the subject vehicles, representing 189 unique VINs. FCA US LLC did not specify when it received these complaints.

c. FCA US LLC had identified 104 Field Reports which relate or may relate to the TIPM in the subject vehicles, representing 65 unique VINs. FCA US LLC did not specify when it performed these field reports.

d. FCA US LLC had identified 207 paid warranty claims related to repair or replacement of the TIPM-7 module, representing 126 unique VINs.

76. In 2013, FCA US LLC conducted a safety recall of 2011 and 2012 model year Dodge Nitro and Jeep Liberty vehicles, through which it would "flash" the vehicles' TIPM. The recall was prompted by the fact that the vehicles could experience illuminated airbag warning lamps and restraints not deploying in collisions.

77. In that letter, FCA US LLC stated also that it had identified zero reports of crash, fire, injury, or fatality which relates or may relate to the TIPM in the subject vehicles. However, by the date of that letter consumers had submitted to NHTSA at least six reports describing crashes or fires in the relevant vehicles, rendering FCA US LLC's statement erroneous if not intentionally misrepresentative:

a. On September 7, 2013, a consumer reported that "the TIPM fuse exploded" in a MY 2011 Jeep Grand Cherokee (NHTSA ID No. 10542447).

b. On March 19, 2014, a consumer reported that the "wires and TIPM started melting and smoking and burned" in a MY 2012 Dodge Ram 5500 (NHTSA ID No. 10573426).

c. On March 19, 2014, a consumer reported that the TIPM in a MY 2012 Dodge Ram 5500 had caught fire for the second time in a week and that the consumer had taken the truck to a dealership after the first fire (NHTSA ID No. 10573471).

d. On June 5, 2014, a consumer reported that a five-car pileup occurred immediately behind her because she stalled in the middle of the road due to a faulty TIPM in a MY 2011 Dodge Durango (NHTSA ID No. 10596370).

-12-

SELF v. FCA US LLC - COMPLAINT

e. On September 18, 2014, a consumer reported that her MY 2011 Durango was "smoking" and that a dealership diagnosed the problem as an electrical short in the TIPM (NHTSA ID No. 10637171).

f. On October 30, 2014, a consumer reported a crash caused by a stall in a MY 2008 Jeep Wrangler (NHTSA ID No. 10651411).

*Consumer Complaints to NHTSA*

78. FCA US LLC has knowledge of the fact that the defective TIPMs installed in the Vehicle is prone to sudden failure because of the numerous complaints that consumers have made to NHTSA.

79. Owners of vehicles equipped with a TIPM-7 have submitted at least 240 complaints to NHTSA about electrical problems including stalling, headlights turning off, and failure to start—most, if not all, of which occurred with no warning whatsoever to the driver.

80. By the end of 2011, consumers had submitted over 100 complaints about the TIPM to NHTSA.

81. Some of these complaints describe dangerous situations, indicating that FCA US LLC is putting the lives of consumers and their passengers at risk. When a defective TIPM suddenly fails without warning, a driver loses the ability to safely operate their vehicle.

82. Many of the complaints to NHTSA were made prior to the sale of the Vehicle to Plaintiff.

83. For years, FCA US LLC has monitored drivers' safety-related reports to the NHTSA, which can be viewed on the NHTSA's website. There are several hundred complaints on the NHTSA website and elsewhere online dating back to when the TIPM 7 was first introduced in 2007 model year FCA US LLC vehicles.

84. As early as 2008, drivers of vehicles equipped with the TIPM 7 started contacting the NHTSA to complain that their vehicles were experiencing a host of electrical issues, including uncontrollable activity of the windshield wipers, horn, and alarm system, and the headlights and taillights not working. Drivers also complained that their vehicles would not start and that the vehicles would stall without warning. By the end of 2011, over 100 drivers had complained to the NHTSA that they had experienced some combination of these symptoms, and dealers were

1   diagnosing the problems as stemming from a defective TIPM, with some dealers saying the TIPM

2   was already on a nationwide backorder.

3

4                              *Pre-Release Testing Data*

5   85. FCA US LLC's knowledge of the TIPM defect is also demonstrated by the fact that FCA

6   US LLC studied and tracked TIPM-related issues through exhaustive pre-release testing. In recent

7   years, FCA US LLC has tested models for millions of miles before their release. For example,

8   FCA US LLC employees put seven million miles on multiple 2011 Jeep Grand Cherokee test

9   vehicles before production. Given the speed and frequency with which the TIPM defect manifests,

10  it is not plausible that this testing would not have alerted FCA US LLC to the existence of the

11  TIPM defect. Only FCA US LLC, however, has access to its pre-release testing data.

12  86. FCA US LLC also receives data about how its vehicles are performing in the days, weeks,

13  and months after they are sold. FCA US LLC collects information from both drivers and

14  dealerships, including through complaints, warranty claims, replacement parts data, and other

15  aggregated data sources. FCA US LLC has exclusive access to this information also.

16  87. FCA US LLC is collecting old TIPM parts that have been replaced, in an effort to keep

17  those parts away from public scrutiny. FCA US LLC is requiring anyone who wants to purchase a

18  new TIPM from FCA US LLC to agree to return to FCA US LLC the old TIPM that is being

19  replaced. This requirement affects non-FCA US LLC mechanics and private individuals who seek

20  to keep the original TIPM parts for any reason, including but not limited to examining those parts

21  for defects. In addition, the owners of these vehicles already have paid for the original TIPM parts,

22  and should not have to give up their personal property in order to buy a replacement part; this

23  amounts to an abusive tactic.

24  88. Notwithstanding the history of TIPM problems in its vehicles, FCA US LLC chose to begin

25  installing the TIPM 7 in 2007 model year vehicles and continued to install the TIPM 7 into

26  vehicles through the 2014 model year.

27  89. Given the repeated, severe problems that plagued the TIPM in its vehicles, FCA US LLC

28  understood that the TIPMs posed a heightened risk of problems for consumers and FCA US LLC

1    was particularly aware of and on the lookout for early indicia of TIPM problems.

3    **FCA US LLC's Failure to Disclose the TIPM Defect**

4    90. FCA US LLC has never disclosed the TIPM defect to Plaintiff prior to the purchase of the

5    Subject Vehicle or at any point during ownership of the Subject Vehicle, and FCA US LLC has

6    never instructed its dealerships to disclose the TIPM defect to drivers or potential purchasers or

7    lessees of vehicles equipped with the TIPM-7.

8    91. The TIPM defect was not known or reasonably discoverable by the Plaintiff before

9    purchase or lease, or without experiencing the defect first hand and exposing themselves to an

10   unreasonable safety risk.

11   92. FCA US LLC has remained silent even as it issued a service bulletin, conducted internal

12   investigations, and saw the TIPM replacement parts go on national backorder and hundreds of

13   complaints for effected vehicles were lodged with the NHTSA.

14   93. FCA US LLC's refusal to publically acknowledge the defect has created widespread

15   confusion. FCA US LLC's failure to notify consumers, dealerships, or auto-technicians prevents

16   the TIPM problem from being efficiently diagnosed. Drivers often do not realize that the

17   symptoms they are experiencing are due to the TIPM defect or that prompt action is needed to

18   ensure they do not experience stalling, headlight loss, or other dangerous symptoms in the future.

19   Likewise, the lack of information makes it less likely that dealerships and auto-technicians will be

20   able to diagnose and fix the TIPM defect, or advise Plaintiff about the dangers of driving the

21   Subject Vehicle.

22   94. As a result of FCA US LLC's inaction and silence, Plaintiff was entirely unaware that

23   Plaintiff purchased, and continues to drive, unsafe and unreliable vehicles. As FCA US LLC

24   knows, a reasonable person would consider the TIPM defect important and would not purchase or

25   lease a vehicle equipped with the TIPM defect were the defect disclosed in advance, or would pay

26   substantially less for the vehicle.

27   ///

28   ///

**PLAINTIFF'S EXPERIENCES**

95. On or around January 3, 2011, Plaintiff delivered the Subject Vehicle to an authorized FCA US LLC repair facility for repair. Plaintiff complained that the Vehicle's U-Connect function was inoperable, and it would not display her phone. The repair facility technicians found a connector pin pushed out, and repaired it. The Subject Vehicle was returned to Plaintiff, and the service manager at the authorized repair facility notified Plaintiff that the Subject Vehicle was operating normally and was safe to drive. Plaintiff reasonably relied on this representation by the manager of the expert repair technicians.

96. On or around February 10, 2011, Plaintiff delivered the Subject Vehicle to an authorized FCA US LLC repair facility for repair, again complaining that the Vehicle's U-Connect function was inoperable, and it would not display her phone. The repair facility technicians found that the U-Connect module had an internal defect. The technicians removed the ignition off-draw fuse, placed a special order on a new U-Connect module and directed Plaintiff to return. The Subject Vehicle was returned to Plaintiff, and the service manager at the authorized repair facility notified Plaintiff that the Subject Vehicle was operating normally and was safe to drive. Plaintiff reasonably relied on this representation by the manager of the expert repair technicians.

97. On or around May 4, 2011, Plaintiff delivered the Subject Vehicle to an authorized FCA US LLC repair facility to follow up with the previous repair attempt. Plaintiff additionally complained that the engine made a low ticking noise when starting the vehicle cold. The repair facility technicians installed and reprogrammed the U-Connect hands-free module, and reprogrammed the powertrain control module ("PCM"). After three (3) days, the Subject Vehicle was returned to Plaintiff, and the service manager at the authorized repair facility notified Plaintiff that the Subject Vehicle was operating normally and was safe to drive. Plaintiff reasonably relied on this representation by the manager of the expert repair technicians.

98. On or around December 19, 2012, Plaintiff delivered the Subject Vehicle to an authorized FCA US LLC repair facility for repair. Plaintiff again complained of a tapping noise coming from the engine are when starting the vehicle. The repair facility technicians replaced all lifters, the #6 cylinder valves, gaskets, and seals. The Subject Vehicle was not returned to Plaintiff until twenty

(20) days later. When the Subject Vehicle was returned to Plaintiff, the service manager at the authorized repair facility notified Plaintiff that the Subject Vehicle was operating normally and was safe to drive. Plaintiff reasonably relied on this representation by the manager of the expert repair technicians.

99. On or around March 25, 2013, Plaintiff delivered the Subject Vehicle to an authorized FCA US LLC repair facility for repair, again complaining of a clicking or tapping noise coming from the engine on cold start up. Plaintiff also complained that the Subject Vehicle's alarm would go off on its own when locking the doors with the remote. The repair facility technicians could not identify the source of these problems. After four (4) days in the repair facility, the Subject Vehicle was returned to Plaintiff, and the service manager at the authorized repair facility notified Plaintiff that the Subject Vehicle was operating normally and was safe to drive. Plaintiff reasonably relied on this representation by the manager of the expert repair technicians.

100.     On or around August 15, 2013, Plaintiff delivered the Subject Vehicle to an authorized FCA US LLC repair facility for repair, again complaining of a clicking or tapping noise coming from the engine on cold start up. The repair facility technicians could not identify the source of the problem. The Subject Vehicle was returned to Plaintiff, and the service manager at the authorized repair facility notified Plaintiff that the Subject Vehicle was operating normally and was safe to drive. Plaintiff reasonably relied on this representation by the manager of the expert repair technicians.

101.     On or around July 30, 2015, Plaintiff delivered the Subject Vehicle to an authorized FCA US LLC repair facility for repair. Plaintiff complained of a rattling noise coming from the engine on start up, of the gas cap light coming on despite Plaintiff replacing the gas cap, and of the Subject Vehicle hesitating and shuddering when going uphill. The repair facility technicians replaced the right and left timing chain tensioners, the timing cover seals, and the evaporative system integrity module ("ESIM"). The Subject Vehicle was not returned to Plaintiff until twenty-one (21) days later. When the Subject Vehicle was returned to Plaintiff, the service manager at the authorized repair facility notified Plaintiff that the Subject Vehicle was operating normally and was safe to drive. Plaintiff reasonably relied on this representation by the manager of the expert

1   repair technicians.

2   102.    On or around August 29, 2015, Plaintiff delivered the Subject Vehicle to an

3   authorized FCA US LLC repair facility for repair, complaining that the engine started hesitating

4   badly though the timing chains had just been replaced. The repair facility technicians could not

5   identify the source of the problem. After ten (10) days in the repair facility, the Subject Vehicle

6   was returned to Plaintiff, and the service manager at the authorized repair facility notified Plaintiff

7   that the Subject Vehicle was operating normally and was safe to drive.  Plaintiff reasonably relied

8   on this representation by the manager of the expert repair technicians.

9   103.    On or around February 25, 2016, Plaintiff delivered the Subject Vehicle to an

10   authorized FCA US LLC repair facility for repair. Plaintiff again complained that the engine made

11   a rattling noise on cold start up, and that the vehicle would at times surge. The repair facility

12   technicians replaced the spark plugs, but could not identify the cause of the rattling noise. The

13   Subject Vehicle was returned to Plaintiff, and the service manager at the authorized repair facility

14   notified Plaintiff that the Subject Vehicle was operating normally and was safe to drive.  Plaintiff

15   reasonably relied on this representation by the manager of the expert repair technicians.

16

17              All Statute of Limitations Periods are Tolled by the Discovery Rule and the

18                             Doctrine of Fraudulent Concealment

19   104.  FCA US LLC concealed the fact that the Subject Vehicle was equipped with a defective

20   TIPM7. FCA US LLC also concealed the major safety concerns related to the likely failures of the

21   TIPM7.

22   105.  FCA US LLC continued to misrepresent its ability to repair the Subject Vehicle in

23   conformity with the warranty throughout the warranty period.

24   106.  At all relevant times, FCA US LLC was aware of the defects in the TIPM7.

25   107.  As described in more detail above, as early as 2007, FCA US LLC began issuing

26   significant technical service bulletins as the result of NHTSA investigations to its authorized

27   dealers explaining the widespread issues with the TIPM7.  At no point prior to the sale of the

28   vehicle to Plaintiff or during Plaintiff's ownership of the Subject Vehicle did FCA US LLC or an

1    authorized dealer ever inform Plaintiff of the ongoing irreparable defect.

2       108.   FCA US LLC had a duty to disclose the concealed facts alleged above because FCA US

3    LLC knew that Plaintiff did not know a material fact and further knew that such facts were not

4    readily accessible to the Plaintiff because FCA US LLC actively concealed those facts.

5       109.   FCA US LLC had a duty to disclose the concealed facts alleged above because FCA US

6    LLC was in a superior position of knowledge.

7       110.   FCA US LLC had a duty to disclose the concealed facts alleged above because FCA US

8    LLC actively concealed material facts in order to induce a false belief.

9       111.   FCA US LLC intended for Plaintiff to rely on those misrepresentations to conceal the

10   fact that the defective TIPM7 could not be repaired.

11      112.   Prior to the sale of the Subject Vehicle, and at all times thereafter, Defendant therefore

12   failed to disclose the existence of the vehicle's inherent defects to Plaintiff, and Defendant failed to

13   disclose its inability to repair these inherent defects, which prevented the Subject Vehicle from

14   conforming to its applicable warranties.  In effect, after the sale of the Subject Vehicle, Defendant

15   fraudulently concealed from purchasers, including Plaintiff, the fact that the dealers were not

16   properly repairing the defects to the TIPM7, and knew that the limited work that FCA US LLC had

17   authorized its dealerships to perform on those vehicles would not properly repair them.

18      113.   On or around August of 2015, Plaintiff became aware of a class action settlement

19   involving the Totally Integrated Power Module (TIPM) had been reached.  That letter discussed a

20   recall related to the TIPM, reimbursement for past repairs related to the TIPM, and an extended

21   warranty for a part effected by the TIPM.  Specifically, the letter stated: "The [class action] lawsuit

22   claims that the Totally Integrated Power Module (TIPM) installed in model-years 2011, 2012, and

23   2013 Dodge Durango and Jeep Grand Cherokee vehicles is defective and poses a safety hazard.

24   Plaintiff alleged that FCA US violated the law by failing to disclose the defect to consumers and

25   that it should be required to repair the defect free of charge and reimburse consumers for the out-

26   of-pocket expenses."  This was the earliest date that FCA US LLC made any attempt to notify

27   Plaintiff of any of the known defects in the TIPM7.  This date was the earliest date that Plaintiff

28   could have had any sort of notice of the facts which give rise to Plaintiff's fraud causes of action.

1  FCA US LLC did not disclose any of this information prior to the sale of the vehicle to Plaintiff or
2  at any earlier date during ownership.  Accordingly, Plaintiff could not have discovered Plaintiff's
3  claims related to fraud prior to October 2015.  Plaintiff could not, through reasonable and diligent
4  investigation, have discovered such on an earlier date because of FCA US LLC's fraudulent
5  misrepresentations and concealment of the defects in the TIPM7 in Plaintiff's vehicle, as
6  previously alleged above,  and because of the repeated false assurances of FCA US LLC and its
7  service dealership agents made to Plaintiff, on which Plaintiff reasonably relied, that FCA US LLC
8  had and would repair any problems with the transmission in Plaintiff's vehicle that occurred during
9  the express warranty period.   The statute of limitations for each of Plaintiff's claims against FCA
10  US LLC was therefore tolled under the delayed discovery rule and the doctrine of fraudulent
11  concealment until Plaintiff could have first discovered on or around October 2015 that FCA US
12  LLC had concealed the irreparable defects in the TIPM7.

13      114.   Because FCA US LLC failed to disclose these foregoing facts to Plaintiff, all statute of
14  limitations periods with respect to sale of the Subject Vehicle were tolled by the doctrines of
15  fraudulent concealment, the discovery rule, and/or equitable tolling.  As alleged herein, FCA US
16  LLC wrongfully concealed the fact (1) that the TIPM7 had a irreparable defect that posed
17  significant safety risk to the drivers and the public; and (2) that its dealerships were making
18  inadequate repairs that were incapable of addressing the root cause of the Vehicle's malfunctions.

19      115.   Plaintiff did not discover the operative facts that are the basis of the claims alleged
20  herein because the facts were concealed in confidential and privileged documents, which a
21  consumer would not know about and could not obtain.

22      116.   No amount of diligence by Plaintiff could have led to the discovery of these facts
23  because they were kept secret by FCA US LLC and, therefore, Plaintiff was not at fault for failing
24  to discover these facts.

25      117.   Plaintiff did not have actual knowledge of facts sufficient to put her on notice.  Plaintiff
26  did not know, nor could have known, about FCA US LLC's inability to repair the defects in its
27  TIPM7 because, as alleged above, FCA US LLC kept this information highly confidential, and its
28  dealership assured Plaintiff that its repairs were effective.

1    <u>All Statute of Limitations Periods are Tolled by the Tolling Doctrine Established in *American Pipe*</u>

2    <u>*& Construction Co. v. Utah* (1974) 414 U.S. 538 As a Result of the Class Action *Velasco, et al v.*</u>

3                                        *Chrysler Group LLC*

4         118.   Plaintiff gave timely notice of Plaintiff's claims against FCA US LLC in the present

5    action as a putative class member in a class action, *Velasco, et al v. Chrysler Group LLC*, United

6    States District Court, Central District of California, Case No. 2:13-cv-08080-DDP-VBK, which

7    was filed on November 1, 2013. That action was filed within three years of the date of the alleged

8    fraudulent act by FCA US LLC in the present action, as previously described in detail above.

9         119.   There is no prejudice to FCA US LLC in gathering evidence to defend against Plaintiff's

10   individual claims because the class definition in the class action complaint within which Plaintiff

11   was a putative class member and the allegations in the class action lawsuit, *Velasco, et al v.*

12   *Chrysler Group LLC*, United States District Court, Central District of California, Case No. 2:13-

13   cv-08080-DDP-VBK, put FCA US LLC on notice of the facts that give rise to Plaintiff's

14   individual action, the witnesses necessary for FCA US LLC to defend Plaintiff's individual action,

15   and the causes of action against FCA US LLC asserted in Plaintiff's individual action.

16        120.   *Velasco, et al v. Chrysler Group LLC*, United States District Court, Central District of

17   California, Case No. 2:13-cv-08080-DDP-VBK alleged the same material facts on behalf of

18   Plaintiff as a putative class member as are being alleged by Plaintiff in the present individual

19   action.

20        121.   The facts alleged in *Velasco, et al v. Chrysler Group LLC*, United States District Court,

21   Central District of California, Case No. 2:13-cv-08080-DDP-VBK are substantially similar, if not

22   identical to the facts alleged herein.

23        122.   The allegations in *Velasco, et al v. Chrysler Group LLC*, United States District Court,

24   Central District of California, Case No. 2:13-cv-08080-DDP-VBK are based on the same subject

25   matter and similar evidence as the instant complaint.   Those allegations concern the same

26   evidence, memories, and witnesses as the subject matter in the instant complaint.

27        123.   The *Velasco* class action certainly protected the efficiency and economy of litigation

28   because that class action settled as to thousands of consumers nationwide through a single action.

1   The *Velasco* class was certified and the final settlement was approved by the District Court,
2   making the class action lawsuit an efficient means of pursuing such claims.

3       124.   The tolling of Plaintiff's individual statute of limitations encourages the protection of
4   efficiency and economy in litigation as promoted by the class action device, so that a putative class
5   member would not find it necessary to seek to intervene or to join individually because of fear the
6   class might never be certified or a putative class member may subsequently seek to request
7   exclusion.

8       125.   The running of all statute of limitations on each of Plaintiff's claims asserted against
9   FCA US LLC in the present action were therefore tolled by *American-Pipe* tolling during the
10   entire pendency of the *Velasco* class action (i.e., from the date on which the *Velasco* class action
11   was filed on November 1, 2013 to the date on which Plaintiff filed the instant action).

13   <u>All Statute of Limitations Periods are Tolled Under California Law by the Doctrine of Equitable</u>
14   <u>Tolling As a Result of the Class Action *Velasco et al v. Chrysler Group LLC*</u>

15       126.   Plaintiff gave timely notice of Plaintiff's claims against FCA US LLC in the present
16   action as a putative class member in a class action, *Velasco, et al v. Chrysler Group LLC*, United
17   States District Court, Central District of California, Case No. 2:13-cv-08080-DDP-VBK, which
18   was filed on November 1, 2013.  That action was filed within three years of the date of the alleged
19   fraudulent act by FCA US LLC in the present action, as previously described in detail above.

20       127.   There is no prejudice to FCA US LLC in gathering evidence to defend against Plaintiff's
21   individual claims because the class definition in the class action complaint within which Plaintiff
22   was a putative class member and the allegations in the class action lawsuit, *Velasco, et al v.*
23   *Chrysler Group LLC*, United States District Court, Central District of California, Case No. 2:13-
24   cv-08080-DDP-VBK, put FCA US LLC on notice of the facts that give rise to Plaintiff's
25   individual action, the witnesses necessary for FCA US LLC to defend Plaintiff's individual action,
26   and the causes of action against FCA US LLC asserted in Plaintiff's individual action.

27       128.   *Velasco, et al v. Chrysler Group LLC*, United States District Court, Central District of
28   California, Case No. 2:13-cv-08080-DDP-VBK alleged the same material facts on behalf of

-22-

SELF v. FCA US LLC - COMPLAINT

1    Plaintiff as a putative class member as are being alleged by Plaintiff in the present individual
2    action.

3        129.   The facts alleged in *Velasco, et al v. Chrysler Group LLC*, United States District Court,
4    Central District of California, Case No. 2:13-cv-08080-DDP-VBK are substantially similar, if not
5    identical to the facts alleged herein.

6        130.   The allegations in *Velasco, et al v. Chrysler Group LLC*, United States District Court,
7    Central District of California, Case No. 2:13-cv-08080-DDP-VBK are based on the same subject
8    matter and similar evidence as the instant complaint.   Those allegations concern the same
9    evidence, memories, and witnesses as the subject matter in the instant complaint.

10       131.   The *Velasco* class action certainly protected the efficiency and economy of litigation
11   because that class action settled as to thousands of consumers nationwide through a single action.
12   The *Velasco* class was certified and the final settlement was approved by the District Court,
13   making the class action lawsuit an efficient means of pursuing such claims.

14       132.   Plaintiff acted reasonably and in good faith in filing the instant action.   Shortly after
15   discovering FCA US LLC's fraudulent behavior, Plaintiff opted out of the class action settlement
16   in *Velasco* and filed the instant action to pursue his individual rights without delay.

17       133.   The tolling of Plaintiff's individual statute of limitations encourages the protection of
18   efficiency and economy in litigation as promoted by the class action devise, so that a putative class
19   member would not find it necessary to seek to intervene or to join individually because of fear the
20   class might never be certified or a putative class member may subsequently seek to request
21   exclusion.

22       134.   The running of all statute of limitations on each of Plaintiff's claims asserted against
23   FCA US LLC in the present action were therefore tolled by *American-Pipe* tolling during the
24   entire pendency of the *Velasco* class action (i.e., from the date on which the *Velasco* class action
25   was filed on November 1, 2013 to the date on which Plaintiff filed the instant action).

26   ///
27   ///
28   ///

-23-

SELF v. FCA US LLC - COMPLAINT

<u>Plaintiff Was Ultimately Defined Out of the Final Settlement Class In the *Velasco, et al v.*</u>
<u>*Chrysler Group LLC* Class Action</u>

135.     Plaintiff was a putative member of the *Velasco* class action at its inception because he owned a 2011 Jeep Liberty; however, Plaintiff was ultimately defined out of the final settlement class by, at the very latest, August 31, 2015.

136.     The initial class definition, as defined in the initial complaint in the *Velasco* class action, included many models Jeep, Dodge and Chrysler brands, including:

- 2011-2012 model year Jeep Grand Cherokee;
- 2011-2012 model year Dodge Durango;
- 2010-2014 model year Dodge Grand Caravan;
- 2010-2014 model year Chrysler Town & Country;
- 2010-2014 model year Chrysler Grand Voyager;
- 2012-2014 model year Dodge Ram Cargo Van;
- 2010-2012 model year Dodge Nitro;
- 2010-2012 model year Jeep Liberty;
- 2010-2012 model year Dodge Ran 1500 pickup;
- 2010-2012 model year Dodge Ram 2500 pickup;
- 2011-2012 model year Dodge Ram 3500 Cab Chassis;
- 2011-2013 model year Dodge Ram 4400/5500 Cab Chassis;
- 2010-2012 model year Dodge Ram 3500 pickup;
- 2010-2014 model year Jeep Wrangler;
- 2010 model year Dodge Journey.

137.     The class definition included in the initial complaint, detailed above, included Plaintiff's 2011 Jeep Liberty and, as such, Plaintiff was a putative member of the class as initially defined.

138.     On or around August 31, 2015, United States District Judge, the Honorable Dean D. Pregerson, signed the Amended Order Granting Preliminary Approval of Class Settlement in the *Velasco, et al. v. Chrysler Group, LLC,* class action ("Class Settlement"), which included a

1  definition of the final settlement class.

2  139.    The final settlement class ("Final Settlement Class") is defined, in pertinent part, as:

3
4  > All persons who purchased or leased a model-year 2011, 2012, and/or 2013 Dodge Durango or Jeep Grand Cherokee vehicle in the United States.

5  140.    Pursuant to the Class Settlement, all members of the Final Settlement Class were to
6  be sent individual notice of the Proposed Settlement ("Class Notice").

7  141.    The Class Notice provided information to members of the Final Settlement Class on
8  how to request exclusion from the Final Settlement Class.

9  142.    The Proposed Settlement required that any members of the Final Settlement Class
10  who did not want to be included in the Proposed Settlement in the *Velasco* class action to request
11  exclusion from the Final Settlement Class in the time and manner provided in the Class Notice.

12  143.    Plaintiff's Subject Vehicle is not included in the final class definition. As such,
13  Plaintiff is not a member of the Final Settlement Class, as defined by the Class Settlement.
14  Therefore, Plaintiff was defined out of the settlement class by, at the very latest, August 31, 2015.

15  144.    Plaintiff was not required to request exclusion from the Final Settlement Class
16  because Plaintiff was not a member of the Final Settlement Class. As such, the Final Order does
17  not bar Plaintiff from bringing this action against Defendant.

18
19  ## FIRST CAUSE OF ACTION

20  **Violation of the Song-Beverly Act – Breach of Express Warranty**

21  138. Plaintiff incorporates herein by reference each and every allegation contained in the
22  preceding and succeeding paragraphs as though herein fully restated and re-alleged.

23  139. Express warranties accompanied the sale of the vehicle to Plaintiff by which FCA US
24  LLC undertook to preserve or maintain the utility or performance of Plaintiff's vehicle or provide
25  compensation if there was a failure in such utility or performance.

26  140. The vehicle was delivered to Plaintiff with serious defects and nonconformities to
27  warranty and developed other serious defects and nonconformities to warranty including, but not
28  limited to transmission, electrical, suspension, and engine defects.

-25-

1    141. Pursuant to the Song-Beverly Consumer Warranty Act (herein after the "Act") Civil Code

2    sections 1790 *et seq.* the vehicle constitutes "consumer goods" used primarily for family or

3    household purposes, and Plaintiff has used the vehicle primarily for those purposes.

4    142. Plaintiff is a "buyer" of consumer goods under the Act.

5    143. Defendant FCA US LLC is a "manufacturer" and/or "distributor" under the Act.

6    144. The foregoing defects and nonconformities to warranty manifested themselves within the

7    applicable express warranty period. The nonconformities substantially impair the use, value and/or

8    safety of the vehicle.

9    145. Plaintiff delivered the vehicle to an authorized FCA US LLC repair facility for repair of

10    the nonconformities.

11    146. Defendant was unable to conform Plaintiff's vehicle to the applicable express after a

12    reasonable number of repair attempts.

13    147. Notwithstanding Plaintiff's entitlement, Defendant FCA US LLC has failed to either

14    promptly replace the new motor vehicle or promptly make restitution in accordance with the Song-

15    Beverly Act.

16    148. By failure of Defendant to remedy the defects as alleged above, or to issue a refund or

17    replacement, Defendant is in breach of its obligations under the Song-Beverly Act.

18    149. Under the Act, Plaintiff is entitled to reimbursement of the price paid for the vehicle less

19    that amount directly attributable to use by the Plaintiff prior to discovery of the nonconformities.

20    150. Plaintiff is entitled to all incidental, consequential, and general damages resulting from

21    Defendant's failure to comply with their obligations under the Song-Beverly Act.

22    151. Plaintiff is entitled under the Song-Beverly Act to recover as part of the judgment a sum

23    equal to the aggregate amount of costs and expenses, including attorney's fees, reasonably incurred

24    in connection with the commencement and prosecution of this action.

25    152. Plaintiff is entitled in addition to the amounts recovered, a civil penalty of up to two

26    times the amount of actual damages in that FCA US LLC, has willfully failed to comply with its

27    responsibilities under the Act.

28

## SECOND CAUSE OF ACTION

### Violation of the Song-Beverly Act – Breach of Implied Warranty

153. Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

154. FCA US LLC and its authorized dealership at which Plaintiff purchased the Subject Vehicle had reason to know the purpose of the Subject Vehicle at the time of sale of the Subject Vehicle. The sale of the Subject Vehicle was accompanied by an implied warranty of fitness.

155. The sale of the Subject Vehicle was accompanied by an implied warranty that the Subject Vehicle was merchantable pursuant to Civil Code section 1792.

156. The Subject Vehicle was not of the same quality as those generally acceptable in the trade because it was equipped with transmission, electrical, suspension, and engine defects.

157. The Subject Vehicle was not fit for the ordinary purpose for which such goods are used because it was equipped with transmission, electrical, suspension, and engine defects.

158. The Subject Vehicle did not measure up to the promises or facts stated on the container or label because it was equipped with transmission, electrical, suspension, and engine defects.

159. Plaintiff is entitled to justifiably revoke acceptance of the Subject Vehicle under Civil Code section 1794, *et seq*; Plaintiff hereby revokes acceptance of the Subject Vehicle.

160. Plaintiff is entitled to replacement or reimbursement pursuant to Civil Code section 1794, *et seq*.

161. Plaintiff is entitled to rescission of the contract pursuant to Civil Code section 1794, *et seq*. and Commercial Code section 2711.

162. Plaintiff is entitled to recover any "cover" damages under Commercial Code sections 2711, 2712, and Civil Code section 1794, *et seq*.

163. Plaintiff is entitled to recover all incidental and consequential damages pursuant to 1794 *et seq* and Commercial Code sections 2711, 2712, and 2713 *et seq*.

///

///

///

### THIRD CAUSE OF ACTION

#### Fraudulent Inducement – Concealment

164. Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

165. FCA US LLC concealed a known defect from Plaintiff. The defective component is called the totally integrated power module (or TIPM). The TIPM consists of a computer, fuses, and internal relays, and is responsible for controlling and distributing electrical power to the entire vehicle—everything from steering and brakes, to the alarm, headlights, and the fuel pump.

166. Since the TIPM controls power to a wide variety of essential vehicle systems, including safety and security systems, the defect often leaves the vehicles incapable of providing reliable or safe transportation. This defect may cause a vehicle to fail to start (or take dozens of attempts before the engine will turn over) because of the defect, and vehicles start up at other times only to stall, sometimes while traveling at high speeds. The TIPM defect has caused headlights and taillights to suddenly shut off. It has also caused horns to honk, car alarms to sound, and windshield wipers to activate all on their own.

167. FCA US LLC intentionally failed to disclose the known TIPM defect, which was known only to it.

168. FCA US LLC concealed and suppressed material facts to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that FCA US LLC was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.

169. FCA US LLC's deceptive omissions infected all purchases and leases of vehicles equipped with the TIPM-7, regardless of whether the vehicles were used or new at the time of acquisition. As early as 2007, FCA US LLC knew of the TIPM defects. FCA US LLC had ample opportunity to communicate to the public, its dealerships, and government regulators in a fashion that would have informed the car-buying public about the TIPM defects in vehicles equipped with the TIMP-7. For example, FCA US LLC could have recalled the vehicles. Plaintiff reasonably, justifiably, and detrimentally relied on FCA US LLC's silence about the TIPM defect when

1   deciding whether to purchase or lease a vehicle equipped with a TIPM-7, in part because FCA US

2   LLC was, and still is, in a position of superior knowledge about the TIPM defects.  Plaintiff

3   reasonably trusted that FCA US LLC would not sell a dangerously defective vehicle or fail to

4   recall those vehicles – or otherwise make widely known that the vehicles were dangerously

5   defective such that current and prospective owners and lessees could make informed decisions to

6   protect themselves and their families.

7       170.   FCA US LLC acted with malice and a willful and conscious disregard for the rights and

8   safety of the Plaintiff and the public in committing these fraudulent acts.

9       171.   FCA US LLC had, and still has, a duty to disclose the TIPM defects because they were

10   known and/or accessible only the FCA US LLC, which had superior knowledge and access to the

11   relevant facts, and because FCA US LLC knew that the relevant facts were not known or

12   reasonably discoverable by Plaintiff.

13       172.   Under the National Traffic and Motor Vehicle Safety Act (the "Safety Act"), 49 U.S.C.

14   §§ 30101-30183, FCA US LLC had the duty to disclose the TIPM defects to NHTSA, and by

15   extension and implication to the public. *Id.* § 30118(c). If FCA US LLC had disclosed the TIPM

16   defects to NHTSA, NHTSA would have made that information public on its websites

17   (www.safecar.gov and www.nhtsa.dot.gov) and its automobile safety telephone hotline.

18       173.   FCA US LLC still has not made full and adequate disclosure and continues to defraud

19   Plaintiff by concealing material information regarding the TIPM defects that exist in the Vehicle

20   and the risks posed by those defects.

21       174.   FCA US LLC actively concealed and/or suppressed these material facts, in whole or in

22   part, to protect its profits and avoid recalls that would have hurt the brand's image and cost FCA

23   US LLC money, and it did so at the expense of Plaintiff.

24       175.   Because FCA US LLC knew that any reasonable consumer would not purchase a

25   vehicle with a defective TIPM, or would pay only substantially less for that vehicle, and FCA US

26   LLC was concealing material information about the TIPM defects, FCA US LLC must have

27   known that Plaintiff was acting on the basis of mistaken knowledge that their vehicles were safe

28   and reliable when they decided to purchase or lease them at market price (without a discount to

1    reflect that they contained a defective TIPM).

2       176.   Plaintiff could not have discovered the TIPM defect because FCA US LLC kept all

3    testing information confidential.

4       177.   That FCA US LLC actively concealed an important fact from Plaintiff or prevented her

5    from discovering that fact.

6       178.   Plaintiff did not know about the TIPM defect.

7       179.   FCA US LLC intended to deceive Plaintiff by continuing to market the vehicle and

8    concealing the existence of a known TIPM defect which posed major safety concerns.

9       180.   Had the omitted information been disclosed, Plaintiff reasonably would have behaved

10   differently.

11      181.   Plaintiff was harmed.

12      182.   FCA US LLC's concealment of the TIPM defect was a substantial factor in causing

13   Plaintiff's harm.

14      183.   The concealment substantially influenced Plaintiff to purchase to Subject Vehicle;

15   Plaintiff would not have purchased the Subject Vehicle had the TIPM defect been disclosed prior

16   to sale.

17      184.   The concealed TIPM defect was material.

18

19                              **PRAYER FOR RELIEF**

20      WHEREFORE, Plaintiff prays for judgment against Defendants, as follows:

21          a. For general, special and actual damages according to proof at trial;

22          b. For rescission of the purchase contract and restitution of all monies expended;

23          c. For diminution in value;

24          d. For incidental and consequential damages according to proof at trial;

25          e. For civil penalty in the amount of two times Plaintiff's actual damages;

26          f. For prejudgment interest at the legal rate;

27          g. For punitive damages pursuant;

28          h. For reasonable attorney fees and costs of suit; and

-30-

SELF v. FCA US LLC - COMPLAINT

i. For such other relief as the Court deems just and proper under the circumstances.

Dated: July 18, 2017

KNIGHT LAW GROUP, LLP

Steve Mikhov (SBN 224676)
Attorneys for Plaintiff,
SANDY G. SELF

Plainitff, SANDY G. SELF, hereby demands trial by jury in this action.

-31-

# EXHIBIT 1

# RETAIL INSTALLMENT SALE CONTRACT – SIMPLE FINANCE CHARGE

Dealer Number ______ Contract Number ______ R O S Number ______ Stock Number 1JL000

| Buyer Name and Address (Including County and Zip Code) | Co-Buyer Name and Address (Including County and Zip Code) | Creditor-Seller (Name and Address) |
|---|---|---|
| SANDY G SELF<br>6311 N BOND AVE<br>FRESNO CA 93710<br>FRESNO | | FRESNO CHRYSLER DODGE JEEP RAM<br>6162 N. BLACKSTONE<br>FRESNO CA 93710<br>FRESNO |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Creditor - Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New Used | Year | Make and Model | Odometer | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|---|
| NEW | 201 | JEEP LIBERTY | 9 | 1J4PN5GK8BW535012 | ☒ personal, family or household<br>☐ business or commercial |

## FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $ 6440.20 |
|---|---|---|---|---|
| 4.54 % | $ 3482.98 | $ 29104.8 | $ 32587.80 | $ 39028.08 |

(e) means an estimate

YOUR PAYMENT SCHEDULE WILL BE:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| One Payment of | N/A | N/A |
| One Payment of N/A | N/A | N/A |
| 59 Payments | 543.13 | Monthly Beginning 01/08/2011 |
| Payments | N/A | Monthly Beginning N/A |
| One Final Payment | 543.13 | DUE ON 12/08/2015 |

Late Charge. If payment is not received in full within 10 days after it is due, you will pay a late charge of 5% of the part of the payment that is late.
Prepayment. If you pay off all your debt early, you may be charged a minimum finance charge.
Security Interest. You are giving a security interest in the vehicle being purchased.
Additional Information: See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date, minimum finance charges, and security interest.

### ITEMIZATION OF THE AMOUNT FINANCED (Seller may keep part of the amounts paid to others.)

1. Total Cash Price
   - A. Cash Price of Motor Vehicle and Accessories $ 32094.81
     - 1. Cash Price Vehicle $ 32094.81
     - 2. Cash Price Accessories $ N/A
     - 3. Other (Nontaxable) N/A
       - Describe N/A $ N/A
       - Describe N/A $ N/A
   - B. Document Preparation Fee (not a governmental fee) $ 55.00(B)
   - C. Smog Fee Paid to Seller $ N/A(C)
   - D. (Optional) Theft Deterrent Device (to whom paid) N/A $ N/A(D)
   - E. (Optional) Theft Deterrent Device (to whom paid) N/A $ N/A(E)
   - F. (Optional) Theft Deterrent Device (to whom paid) N/A $ N/A(F)
   - G. (Optional) Surface Protection Product (to whom paid) N/A $ N/A(G)
   - H. (Optional) Surface Protection Product (to whom paid) N/A $ N/A(H)
   - I. Sales Tax (on taxable items in A through H) $ 2885.45(I)
   - J. Optional DMV Electronic Filing Fee $ N/A(J)
   - K. (Optional) Service Contract (to whom paid) N/A $ N/A(K)
   - L. (Optional) Service Contract (to whom paid) N/A $ N/A(L)
   - M. (Optional) Service Contract (to whom paid) N/A $ N/A(M)
   - N. (Optional) Service Contract (to whom paid) N/A $ N/A(N)
   - O. (Optional) Service Contract (to whom paid) N/A $ N/A(O)
   - P. Prior Credit or Lease Balance paid by Seller to N/A $ N/A(P)
     (see downpayment and trade-in calculation)
   - Q. (Optional) Gap Contract (to whom paid) N/A $ N/A(Q)
   - R. (Optional) Used Vehicle Contract Cancellation Option Agreement N/A $ N/A(R)
   - S. Other (to whom paid) N/A $ N/A(S)
     For ______
   - Total Cash Price (A through S) $ 35035.26(1)
2. Amounts Paid to Public Officials ESTIMATED
   - A. License Fees $ 456.00(A)
   - B. Registration/Transfer/Titling Fees $ 45.00(B)
   - C. California Tire Fees $ 8.75(C)
   - D. Other N/A $ N/A(D)
   - Total Official Fees (A through D) $ 509.75(2)
3. Amount Paid to Insurance Companies

## STATEMENT OF INSURANCE

NOTICE. No person is required as a condition of financing the purchase of a motor vehicle to purchase or negotiate any insurance through a particular insurance company, agent or broker. You are not required to buy any other insurance to obtain credit. Your decision to buy or not buy other insurance will not be a factor in the credit approval process.

**Vehicle Insurance**

| | Term | Premium |
|---|---|---|
| $ N/A Ded. Comp., Fire & Theft | N/A Mos. | $ N/A |
| $ N/A Ded. Collision | N/A Mos. | $ N/A |
| Bodily Injury $ N/A Limits | Mos. | $ N/A |
| Property Damage $ N/A Limits | Mos. | $ N/A |
| Medical N/A | Mos. | $ N/A |
| N/A | Mos. | $ N/A |
| Total Vehicle Insurance Premiums | | $ N/A |

UNLESS A CHARGE IS INCLUDED IN THIS AGREEMENT FOR PUBLIC LIABILITY OR PROPERTY DAMAGE INSURANCE, PAYMENT FOR SUCH COVERAGE IS NOT PROVIDED BY THIS AGREEMENT.

You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit.

Buyer X [signature]

Co-Buyer X N/A

Seller X [signature]

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

**Application for Optional Credit Insurance**

☐ Credit Life: ☐ Buyer ☐ Co-Buyer ☐ Both

☐ Credit Disability (Buyer Only)

| | Term | Exp. | Premium |
|---|---|---|---|
| Credit Life | N/A Mos. | | $ N/A |
| Credit Disability | N/A Mos. | | $ N/A |
| Total Credit Insurance Premiums | | | $ N/A |

Insurance Company Name N/A

Home Office Address N/A

N/A

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown above.

You are applying for the credit insurance marked above. Your signature below means that you agree that: (1) You are not eligible for insurance if you have reached your 65th birthday. (2) You are eligible for disability insurance only if you are working for wages or profit 30 hours a week or more on the Effective Date. (3) Only the Primary Buyer is eligible for disability insurance. DISABILITY INSURANCE MAY NOT COVER CONDITIONS FOR WHICH YOU HAVE SEEN A DOCTOR OR CHIROPRACTOR IN THE LAST 6 MONTHS (Refer to "Total Disabilities Not Covered" in your policy for details).

You want to buy the credit insurance.

Date ______ Buyer Signature [signature] Age ______

Date ______ Co-Buyer Signature X N/A Age ______

THIS IS A TRUE AND CORRECT COPY

By: [signature]

| | | |
|---|---|---|
| 4. ☐ Smog Certification or ☐ Exemption Fee Paid to State | $ N/A | (4) |
| 5. Subtotal (1 through 4) | $ 35545.00 | (5) |
| 6. Total Downpayment = | | |
| A. Agreed Value Year 2007 Make CHEVY | 8000.00 | (A) |
| Model COLORADO  License 42669 | | |
| VIN 1GCCS14X78Z28363 | | |
| B. Less Prior Credit or Lease Balance | 4569.80 | (B) |
| C. Net Trade-In (A less B) (indicate if a negative number) | 3440.20 | (C) |
| D. Deferred Downpayment | N/A | |
| E. Manufacturer's Rebate | 3000.00 | (E) |
| F. Other | N/A | (F) |
| G. Cash | N/A | (G) |
| Total Downpayment (C through G) | 6440.20 | |
| (If negative, enter amount line 6 and enter the amount less than zero as a positive number on line 1F paid) | | |
| 7. Amount Financed (5 less 6) | $ 29104.81 | (7) |

AUTO BROKER FEE DISCLOSURE
If this contract reflects the retail sale of a new motor vehicle, the sale is not subject to a fee received by an autobroker from us unless the following box is checked:

☐ Name of autobroker receiving fee, if applicable:

**The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.**

THERE IS NO COOLING-OFF PERIOD UNLESS YOU OBTAIN A CONTRACT CANCELLATION OPTION

Buyer Signature X ____  Date 12/09/10    Co-Buyer Signature X ____  Date ____

Seller FRESNO CHRYSLER DODGE JEEP RAM  Date 12/09/10  By X ____

ORIGINAL LIENHOLDER

THIS IS A TRUE AND CERTIFIED COPY

By: ____

## OTHER IMPORTANT AGREEMENTS

1. **FINANCE CHARGE AND PAYMENTS**

   a. **How we will figure the Finance Charge.** We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed. Creditor-Seller may receive part of the Finance Charge.

   b. **How we will apply payments.** We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose.

   c. **How late payments or early payments change what you must pay.** We based the Finance Charge, Total of Payments, and Total Sale Price shown on the front on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.

   d. **You may prepay.** You may prepay all or part of the unpaid part of the Amount Financed at any time. If you do so, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the date of your payment. As of the date of your payment, if the minimum finance charge is greater than the earned Finance Charge, you may be charged the difference, the minimum finance charge is as follows: (1) $25 if the original Amount Financed does not exceed $1,000, (2) $50 if the original Amount Financed is more than $1,000 but not more than $2,000, or (3) $75 if the original Amount Financed is more than $2,000.

2. **YOUR OTHER PROMISES TO US**

   a. **If the vehicle is damaged, destroyed, or missing.** You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed, or missing.

   > **GAP LIABILITY NOTICE**
   > In the event of theft or damage to your vehicle that results in a total loss, there may be a gap between the amount you owe under this contract and the proceeds of your insurance settlement and deductible. THIS CONTRACT PROVIDES THAT YOU ARE LIABLE FOR THE GAP AMOUNT. An optional gap contract (debt cancellation contract) for coverage of this gap amount may be offered for an additional charge.

   b. **Using the vehicle.** You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.

   c. **Security interest.**
   You give us a security interest in:
   • The vehicle and all parts or goods installed on it;
   • All money or goods received (proceeds) for the vehicle;
   • All insurance, maintenance, service, or other contracts we finance for you; and
   • All proceeds from insurance, maintenance, service, or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.
   This secures payment of all you owe on this contract. It also secures your other agreements in this contract as the law allows. You will make sure the title shows our security interest (lien) in the vehicle.

   d. **Insurance you must have on the vehicle.**
   You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the premium for the insurance and a finance charge equal to the Annual Percentage Rate shown on the front of this contract or, at our option, the highest rate the law permits. If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

   e. **What happens to returned insurance, maintenance, service, or other contract charges.** If we get a refund of insurance, maintenance, service, or other contract charges, you agree that we may subtract the refund from what you owe.

3. **IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES**

   a. **You may owe late charges.** You will pay a late charge on each late payment as shown on the front. Acceptance of a

   e. We will sell the vehicle if you do not get it back. If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle.
   We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us. If you do not pay this amount when we ask, we may charge you interest at the Annual Percentage Rate shown on the face of this contract, not to exceed the highest rate permitted by law, until you pay.

   g. What we may do about optional insurance, maintenance, service, or other contracts. This contract may contain charges for optional insurance, maintenance, service, or other contracts. If we demand that you pay all you owe at once or we repossess the vehicle, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

4. **WARRANTIES SELLER DISCLAIMS**

   If you do not get a written warranty, and the Seller does not enter into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose.
   This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide. If the Seller has sold you a certified used vehicle, the warranty of merchantability is not disclaimed.

5. **Used Car Buyers Guide.** The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.
   Spanish Translation: Guia para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

6. **Applicable Law**
   Federal law and California law apply to this contract. If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.

7. **Warranties of Buyer.** You promise you have given true and correct information in your application for credit, and you have no knowledge that information untrue in the future. We have relied on the truth and accuracy of that information in entering into this contract. Upon request, you will provide us with documents and other information necessary to verify any item contained in your credit application.

You waive the provisions of Calif. Vehicle Code Section 1808.21 and authorize the California Department of Motor Vehicles to furnish your residence address to us.

### CREDIT DISABILITY INSURANCE NOTICE
### CLAIM PROCEDURE

If you become disabled, you must tell us right away. (You are advised to send this information to the same address to which you are normally required to send your payments, unless a different address or telephone number is given to you in writing by us as the location where we would like to be notified.) We will tell you where to get claim forms. You must send in the completed form to the insurance company as soon as possible and tell us as soon as you do.
If your disability insurance covers all of your missed payment(s), WE CANNOT TRY TO COLLECT WHAT YOU OWE OR FORECLOSE UPON OR REPOSSESS ANY COLLATERAL UNTIL THREE CALENDAR MONTHS AFTER your first missed payment is due or until the insurance company pays or rejects your claim, whichever comes first. We can, however, try to collect, foreclose, or repossess if you have any money due and owing us or are otherwise in default when your disability claim is made or if a senior mortgage or lien holder is foreclosing.
If the insurance company pays the claim within the three calendar months, we must accept the money as though you paid on time. If the insurance company rejects the claim within the three calendar months

THIS IS A TRUE AND CERTIFIED COPY

By:

late payment or late charge does not excuse your late payment or mean that you may keep making late payments. If you pay late we may also take the steps described below.

b. **You may have to pay all you owe at once.** If you break your promises (default), we may demand that you pay all you owe on this contract at once, subject to any right the law gives you to reinstate this contract.
Default means:
- You do not pay any payment on time.
- You give false, incomplete, or misleading information on a credit application.
- You start a proceeding in bankruptcy or one is started against you or your property.
- The vehicle is lost, damaged or destroyed, or
- You break any agreements in this contract.
The amount you will owe will be the unpaid part of the Amount Financed plus the earned and unpaid part of the Finance Charge, any late charges, and any amounts due because you defaulted.

c. **You may have to pay collection costs.** You will pay our reasonable costs to collect what you owe, including attorney fees, court costs, collection agency fees, and fees paid for other reasonable collection efforts. You agree to pay a charge not to exceed $15 if any check you give us is dishonored.

d. **We may take the vehicle from you.** If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it. If your vehicle has an electronic tracking device, you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you at your expense. If you do not ask for these items back, we may dispose of them as the law allows.

e. **How you can get the vehicle back if we take it.** If we repossess the vehicle, you may pay to get it back (redeem). You may redeem the vehicle by paying all you owe, or you may have the right to reinstate this contract and redeem the vehicle by paying past due payments and any late charges, providing proof of insurance, and/or taking other action to cure the default. We will provide you all notices required by law to tell you when and how much to pay and/or what action you must take to redeem the vehicle.

or accept, the claim within the time granted thereto on a partial disability and pays less than for a total disability, you will have 35 days from the date that the rejection or the acceptance of the partial disability claim is sent to pay past due payments, or the difference between the past due payments and what the insurance company pays for the partial disability plus late charges. You can contact us, and we will tell you how much you owe. After that time we can take action to collect or foreclose or repossess any collateral you may have given. If the insurance company accepts your claim but requires that you send in additional forms to remain eligible for continued payments, you should send in these completed additional forms no later than required. If you do not send in these forms on time, the insurance company may stop paying, and we will then be able to take action to collect or foreclose or repossess any collateral you may have given.

| Seller's Right to Cancel |
|---|
| a. Seller agrees to deliver the vehicle to you on the date this contract is signed by Seller and you. You understand that it may take a few days for Seller to verify your credit and assign the contract. You agree that if Seller is unable to assign the contract to any one of the financial institutions with whom Seller regularly does business under an assignment acceptable to Seller, Seller may cancel the contract. |
| b. Seller shall give you written notice (or in any other manner in which actual notice is given to you) within 10 days of the date this contract is signed if Seller elects to cancel. Upon receipt of such notice, you must immediately return the vehicle to Seller in the same condition as when sold, reasonable wear and tear excepted. Seller must give back to you all consideration received by Seller, including any trade-in vehicle. |
| c. If you do not immediately return the vehicle, you shall be liable for all expenses incurred by Seller in taking the vehicle from you, including reasonable attorney's fees. |
| d. While the vehicle is in your possession, all terms of the contract, including those relating to use of the vehicle and insurance for the vehicle, shall be in full force and you shall assume all risk of loss or damage to the vehicle. You must pay all reasonable costs for repair of any damage to the vehicle until the vehicle is returned to Seller. |

---

## ARBITRATION CLAUSE
### PLEASE REVIEW - IMPORTANT - AFFECTS YOUR LEGAL RIGHTS

1. EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.
2. IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIVIDUAL ARBITRATIONS.
3. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. If federal law provides that a claim or dispute is not subject to binding arbitration, this Arbitration Clause shall not apply to such claim or dispute. Any claim or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. You may choose one of the following arbitration organizations and its applicable rules: the National Arbitration Forum (Box 50191, Minneapolis, MN 55405-0191 (www.arb-forum.com)), the American Arbitration Association, 335 Madison Ave., Floor 10, New York, NY 10017-4605 (www.adr.org), or any other organization that you may choose subject to our approval. You may get a copy of the rules of these organizations by contacting the arbitration organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law in making an award. The arbitration hearing shall be conducted in the federal district in which you reside unless the Creditor-Seller is a party to the claim or dispute, in which case the hearing will be held in the federal district where this contract was executed. We will advance your filing, administration, service or case management fee and your arbitrator or hearing fee all up to a maximum of $2500, which may be reimbursed by decision of the arbitrator at the arbitrator's discretion. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. If the chosen arbitration organization's rules conflict with this Arbitration Clause, then the provisions of this Arbitration Clause shall control. The arbitrator's award shall be final and binding on all parties, except that in the event of the arbitrator's award for a party is $0 or against a party is in excess of $100,000, or includes an award of injunctive relief against a party, that party may request a new arbitration under the rules of the arbitration organization by a three-arbitrator panel. The appealing party requesting new arbitration shall be responsible for the filing fee and other arbitration costs subject to a final determination by the arbitrators of a fair apportionment of costs. Any arbitration under this Arbitration Clause shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and not by any state law concerning arbitration.

You and we retain any rights to self-help remedies, such as repossession. You and we retain the right to seek remedies in small claims court for disputes or claims within that court's jurisdiction, unless such action is transferred, removed or appealed to a different court. Neither you nor we waive the right to arbitrate by using self-help remedies or filing suit. Any court having jurisdiction may enter judgment on the arbitrator's award. This Arbitration Clause shall survive any termination, payoff or transfer of this contract. If any part of this Arbitration Clause, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable. If a waiver of class action rights is deemed or found to be unenforceable for any reason in a case in which class action allegations have been made, the remainder of this Arbitration Clause shall be unenforceable.

---

NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

The preceding NOTICE applies only if the "personal, family or household" box in the "Primary Use for Which Purchased" section of this contract is checked. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

| Seller assigns its interest in this contract to | | (Assignee) (if different) |
|---|---|---|
| | ☐ Assigned with recourse | under the terms of Seller's agreement(s) with Assignee. |
| | ☐ Assigned without recourse | |
| | ☐ Assigned with limited recourse | |
| Seller FRESNO CHRYSLER DODGE JEEP RAM | By | Title VPFS |

Ally Bank

THIS IS A TRUE AND CERTIFIED COPY

By:

Form No. 553-CA-ARB 1/10

KNIGHT LAW GROUP, LLP
Steve Mikhov (SBN 224676)
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: (310) 552-2250
Fax: (310) 552-7973

Attorneys for Plaintiff,
SANDY G. SELF

E-FILED
7/13/2017 10:44:46 AM
FRESNO COUNTY SUPERIOR COURT
By: D Flautz, Deputy

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF FRESNO

| | |
|---|---|
| SANDY G. SELF,<br><br>    Plaintiff,<br><br>    vs.<br><br>FCA US LLC, a Delaware Limited Liability Company, and DOES 1 through 10, inclusive,<br><br>    Defendants. | Case No.:   17CECG02355<br><br>Unlimited Jurisdiction<br><br>**DEMAND FOR JURY TRIAL**<br><br>*Assigned for All Purposes to the Honorable*<br><br>Department |

## DEMAND FOR JURY TRIAL

Plaintiff, SANDY G. SELF, hereby demands trial by jury in this action.

Dated: July 12, 2017

KNIGHT LAW GROUP, LLP

STEVE MIKHOV (SBN 224676)
Attorneys for Plaintiff,
SANDY G. SELF

-1-

**DEMAND FOR JURY TRIAL**

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Steve Mikhov (SBN 224676)
Knight Law Group, LLP
1801 Century Park East, Suite 2300, Los Angeles, CA 90067
TELEPHONE NO.: (310) 552-2250     FAX NO.: (310) 552-7973
ATTORNEY FOR *(Name):* SANDY G. SELF

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Fresno
STREET ADDRESS: 1130 O Street
MAILING ADDRESS: Same as above
CITY AND ZIP CODE: Fresno, CA 93721
BRANCH NAME: B. F. Sisk Courthouse

*FOR COURT USE ONLY*

E-FILED
7/13/2017 10:44:46 AM
FRESNO COUNTY SUPERIOR COURT
By: D Flautz, Deputy

CASE NAME:
SANDY G. SELF v. FCA US LLC, a Delaware Limited Liability Company, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: 17CECG02355 |
|---|---|---|
| [X] Unlimited   [ ] Limited (Amount demanded exceeds $25,000) (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:  DEPT: |

*Items 1–6 below must be completed (see instructions on page 2):*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[X] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is  [X] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [X] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [X] punitive
4. Number of causes of action *(specify):* 3
5. This case [ ] is  [X] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 7/12/17
Steve Mikhov
_____
(TYPE OR PRINT NAME)

▶

_____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
*www.courtinfo.ca.gov*

CM-010

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property
   Damage/Wrongful Death
Uninsured Motorist (46) *(if the
   case involves an uninsured
   motorist claim subject to
   arbitration, check this item
   instead of Auto)*
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
   Asbestos Property Damage
   Asbestos Personal Injury/
      Wrongful Death
Product Liability *(not asbestos or
   toxic/environmental)* (24)
Medical Malpractice (45)
   Medical Malpractice–
      Physicians & Surgeons
   Other Professional Health Care
      Malpractice
Other PI/PD/WD (23)
   Premises Liability (e.g., slip
      and fall)
   Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
   Intentional Infliction of
      Emotional Distress
   Negligent Infliction of
      Emotional Distress
   Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
   Practice (07)
Civil Rights (e.g., discrimination,
   false arrest) *(not civil
   harassment)* (08)
Defamation (e.g., slander, libel)
   (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
   Legal Malpractice
   Other Professional Malpractice
      *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
   Breach of Rental/Lease
      Contract *(not unlawful detainer
         or wrongful eviction)*
   Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
   Negligent Breach of Contract/
      Warranty
   Other Breach of Contract/Warranty
Collections (e.g., money owed, open
   book accounts) (09)
   Collection Case–Seller Plaintiff
   Other Promissory Note/Collections
      Case
Insurance Coverage *(not provisionally
   complex)* (18)
   Auto Subrogation
   Other Coverage
Other Contract (37)
   Contractual Fraud
   Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
   Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
   Writ of Possession of Real Property
   Mortgage Foreclosure
   Quiet Title
   Other Real Property *(not eminent
      domain, landlord/tenant, or
      foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
   drugs, check this item; otherwise,
   report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
   Writ–Administrative Mandamus
   Writ–Mandamus on Limited Court
      Case Matter
   Writ–Other Limited Court Case
      Review
Other Judicial Review (39)
   Review of Health Officer Order
   Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
   *(arising from provisionally complex
   case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
   Abstract of Judgment (Out of
      County)
   Confession of Judgment *(non-
      domestic relations)*
   Sister State Judgment
   Administrative Agency Award
      *(not unpaid taxes)*
   Petition/Certification of Entry of
      Judgment on Unpaid Taxes
   Other Enforcement of Judgment
      Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
   above)* (42)
   Declaratory Relief Only
   Injunctive Relief Only *(non-
      harassment)*
   Mechanics Lien
   Other Commercial Complaint
      Case *(non-tort/non-complex)*
   Other Civil Complaint
      *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
   Governance (21)
Other Petition *(not specified
   above)* (43)
   Civil Harassment
   Workplace Violence
   Elder/Dependent Adult
      Abuse
   Election Contest
   Petition for Name Change
   Petition for Relief From Late
      Claim
   Other Civil Petition

**CIVIL CASE COVER SHEET**

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA • COUNTY OF FRESNO**<br>**Civil Unlimited Department, Central Division**<br>**1130 "O" Street**<br>**Fresno, California  93724-0002**<br>**(559) 457-1900** | *FOR COURT USE ONLY*<br><br>**Filed by Court** |

TITLE OF CASE:

**Sandy Self vs. FCA US LLC, a Delaware Limited Liability Company**

| | |
|---|---|
| **NOTICE OF CASE MANAGEMENT CONFERENCE AND ASSIGNMENT**<br>**OF JUDGE FOR ALL PURPOSES** | CASE NUMBER:<br>**17CECG02355** |

**To All Parties and their Attorneys of Record:**

> This case has been assigned to Judge **Jeffrey Hamilton** for **all purposes**.
> All future hearings will be scheduled before this assigned judge.

You are required to appear at a Case Management Conference on **November 6, 2017** at **1:30 pm** in **Room 305** of the court located at **1130 "O" Street, Fresno, California.**

You must comply with the requirements set forth in Fresno Superior Court Local Rule Chapter 2.

Failure to appear at the conference may result in imposition of sanctions, waiver of jury trial, or other adverse consequences.

**Defendants:**  Appearance at the Case Management Conference does not excuse you from having to file your response in proper legal form within 30 days after the Summons is served on you. You could lose the case if you do not file your response on time. If you do not know an attorney, and do not have one, you may call an attorney referral service or a legal aide office (*listed in the phone book*).

---

### DECLARATION

I declare under penalty of perjury under the laws of the State of California that I gave a copy of the **Notice of Case Management and Assignment of Judge for All Purposes** to the person who presented this case for filing.

Date:   **July 14, 2017**          Clerk, by _____ , Deputy
                                          **D Flautz**